## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS,
## EASTERN DIVISION

| | | |
|---|---|---|
| GAMALIER RIVERA, | ) | |
| | ) | Case No. |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| REYNALDO GUEVARA, GERI LYNN | ) | |
| YANOW, as special representative of the | ) | |
| ESTATE OF ERNEST HALVORSEN, | ) | |
| ANTHONY RICCIO, ROBERT BIEBEL, | ) | |
| and the CITY OF CHICAGO, | ) | |
| | ) | |
| *Defendants*. | ) | **JURY TRIAL DEMANDED** |
| | ) | |

## COMPLAINT

NOW COMES Plaintiff, REYNALDO GUEVARA, GERI LYNN YANOW, as special representative of the ESTATE OF ERNEST HALVORSEN, ANTHONY RICCIO, ROBERT BIEBEL, and the CITY OF CHICAGO, states as follows:

### INTRODUCTION

1. Plaintiff Gamalier Rivera was only 22 years old when he was arrested, prosecuted, and wrongly convicted of the 1996 shooting of Antonio Diaz and the murder of Jesus Ramos.

2. Plaintiff had nothing to do with the murder. At all times since Defendants first accused him, Plaintiff has maintained his innocence.

3. There was not one piece of physical evidence connecting Plaintiff to the Ramos murder. He had no motive to commit the crime. In fact, there was never any reason to think he had any involvement.

4. Plaintiff's arrest, prosecution, and conviction were based entirely on false evidence manufactured by notorious Chicago Police Detective Reynaldo Guevara and the other Defendants.

5. In order to secure Plaintiff's wrongful prosecution and conviction, the Defendants also suppressed evidence that would have shown Plaintiff was innocent, as well as evidence that could have been used to undermine the testimony of the State's witnesses.

6. Plaintiff is one of at least 39 men and women exonerated after being convicted on murder charges arising in corrupt homicide investigations conducted by Defendant Guevara and his fellow Area Five detectives and supervisors.

7. The Illinois Appellate Court has called Defendant Guevara "a malignant blight on the Chicago Police Department and the judicial system."

8. Cook County courts have found that Defendant Guevara "engaged in a pattern and practice of intimidating, threatening, and influencing witnesses in prior homicide investigations," and that Defendant Guevara had told "bald-faced lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding."

9. In court proceedings, Defendants Guevara, his partner Halvorsen, and their associates have pleaded their Fifth Amendment right not to incriminate themselves in response to questions about their misconduct as police officers, and Defendant Guevara has specifically pleaded his Fifth Amendment right not to incriminate himself on multiple occasions in response to questions about his misconduct during as a police officer, including in connection to the investigation that resulted in Plaintiff's wrongful conviction.

10.     On August 9, 2022, having concluded that convictions obtained by Defendant Guevara cannot stand consistent with due process, Illinois state prosecutors moved to vacate the convictions of eight victims of Defendant Guevara in an unprecedented mass exoneration of murder convictions.

11.     Plaintiff was the 31st person whose conviction was dismissed based on Guevara's misconduct.

12.     In March 2023, the Illinois courts granted Plaintiff a certificate of innocence.

13.     Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

14.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

15.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

16.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction.

## PARTIES

17.     Plaintiff Gamalier Rivera spent nearly 23 years wrongfully incarcerated for a murder that he did not commit.

18.     At all times relevant to the events described in this Complaint, Defendants Reynaldo Guevara, Ernest Halvorsen, Anthony Riccio, Robert Biebel, and other unknown law enforcement officers were police officers in the Chicago Police Department acting under color of law and within the scope of their employment for the City of Chicago.

19.     Geri Lynn Yanow, the special representative for the Estate of Ernest Halvorsen, deceased, is named as a Defendant in her capacity as Special Representative for the Estate of Ernest Halvorsen, as successor in interest and to defend this action on behalf of Defendant Ernest Halvorsen.

20.     The City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Defendants. Each of the Defendants named in this Complaint acted during their investigation of the Ramos murder as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Defendants pursuant to the doctrine of *respondeat superior*. Additionally, the City of Chicago is responsible for the policies and practices of the Chicago Police Department.

21.     Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his individual capacity unless otherwise noted.

**FACTS**

**The Crime**

22.     On the night of April 22, 1996, Javier Cruz and Jesus Ramos were sitting in a red Dodge Colt at approximately 11:30 p.m. in an alley near Grand Avenue and Karlov Avenue.

23.     Antonio Diaz, Antonio's wife Maria Diaz, and Richardini Lopez then arrived in the alley in a red Cadillac and parked it behind the red Colt.

24.     Lopez was the driver, Antonio Diaz was in the passenger seat, and Maria Diaz was in the back seat.[1]

25.     Antonio and Cruz exited their respective vehicles. Antonio then approached Cruz to purchase drugs from him. Cruz walked halfway back down the alley to retrieve the drugs while Antonio stayed near the Dodge Colt.

26.     As Cruz walked down the alley, a white four-door Chevy Blazer with tinted windows drove through the alley.

27.     As it drove, a man leaned out of the passenger-side window and yelled "Disciple killer." The same man then shot a firearm four to five times toward the Dodge Colt before the car sped away.

28.     Antonio Diaz and Ramos both sustained gunshot wounds.

29.     Ramos was rushed to surgery in critical condition and later died during surgery. Antonio Diaz was shot in the lower right abdomen and right thigh and survived.

**Initial Investigation**

30.     Javier Cruz, Antonio Diaz, Richardini Lopez, and Maria Diaz were the only eyewitnesses to the shooting.

31.     Given the circumstances of the shooting—occurring late at night, in a dark alley, lasting just seconds, and with a shooter firing from a moving vehicle with tinted windows—the eyewitnesses could not possibly identify the shooter.

---

[1] They are referred to as Antonio and Maria in this complaint, given their common last name.

32.     Indeed, none of the eyewitnesses recognized the shooter as someone they knew. None of the eyewitnesses could identify any distinguishing features of the shooter. None of the eyewitnesses said they could identify the shooter if they saw him again. And when questioned about what they saw, they could provide little to no descriptive information.

33.     For example, Antonio Diaz spoke to responding officers at the hospital but provided no description of the shooter.

34.     Javier Cruz also gave no description whatsoever to the initial responding detectives. Police specifically reported that Cruz "could add nothing further at that time to assist in the investigation."

35.     Maria Diaz described ducking in the car as soon as she heard the shooting. She told initial responding detectives that the shooter was wearing "dark clothing." Maria could give no further description.

36.     Ramos commented to investigators before he died that he had an earlier altercation with some Insane Unknowns—members of a Chicago gang—from Grand and Karlov, and so he thought his shooter was an Insane Unknown (but he did not know the shooter's name).

37.     Antonio Diaz spoke with the victim Ramos, who told Antonio before his death that he believed the perpetrator was the same person who shot at him (Ramos) and Cruz earlier that day in a separate incident.

38.     The initial investigation therefore pointed to two potential perpetrators, neither of which was Plaintiff.

**Defendants Develop Evidence Pointing to Other Suspects**

39.     One of Ramos' brothers believed a higher-up of the Insane Unknowns, known as "Butchie," was responsible for the shooting.

40.     Ramos' other brother, whom police described as "legit," told the police that Ramos and Butchie had a "beef."

41.     Butchie was seen in his car near Grand and Karlov, near the area of the murder, before the shooting took place.

42.     A security officer for a nearby school confirmed that he saw Butchie with a few others at the time, near the location where Ramos and Cruz were shot at earlier in the day. Butchie then abruptly drove off, and the security guard heard gunshots.

43.     Multiple reports confirm that Ramos and his brother were threatened and targeted by members of the Insane Unknown on several occasions. Ramos himself told police the day of the shooting that a member of the Insane Unknowns was in a car with a gun.

44.     Defendant Riccio explicitly stated in his report that he suspected Butchie ordered a "hit" on Ramos.

45.     Defendants Guevara and Halvorsen showed a photo array of Insane Unknown gang members to Richardini Lopez. The array included pictures of Butchie and his 18-year-old brother Nicholas Gonzalez, also an Insane Unknown member.

46.     According to Defendants, Lopez did not make an identification. There is no explanation in the file for why, despite multiple accounts pointing toward Butchie, the photo array was not shown to the other eyewitnesses.

47.     The photo array shown to Lopez were never preserved nor documented.

48.     There is no record of whether a photo of Plaintiff was included among the photos shown to Lopez, which would have been highly exculpatory.

49.     In addition, police were informed that a 14-year-old named Valerio G. had threatened Ramos and his brother.

50.     Police even arrested that individual for unlawful use of a weapon near Grand and Karlov.

51.     Yet, there is no documentation of any photo arrays or lineups involving Valerio G., or any interviews of this suspect, or any explanation for the absence of such information. Defendants concealed all evidence related to this lead.

**Guevara and Halverson Join the Investigation and Make Plaintiff the Suspect**

52.     Defendants began actively working on the case on June 8, 1996, more than a month after the Ramos shooting, when Officer Ruben Oliveras handed Defendants a photo of Plaintiff.

53.     Without basis, Defendants immediately decided to frame Plaintiff for Ramos's death, and they set about fabricating a case against Plaintiff.

54.     Defendants fabricated identifications of Plaintiff to implicate him in the crime.

55.     Plaintiff had been arrested the month before the crime on cannabis charges. In connection with that arrest, Officer Oliveras had Plaintiff's photo in his possession for a month before giving it to Defendant Guevara.

56.     Armed with Plaintiff's photo, Defendant Guevara proceeded to manipulate identification procedures to ensure Plaintiff was identified as the shooter.

57.     Defendant Guevara provided no reason as to why he suspected Plaintiff and later admitted that until this point he had only a "minimal description" of the perpetrator.

58.     Moreover, Defendants conducted identification procedures with witnesses who had not seen the shooter at all.

59.     Defendants first showed Lopez a gang book, from which Lopez identified 5 or 6 individuals who looked similar to the shooter.

60.     Defendants left the room and then returned with 5 to 6 photos.

61.     Defendant Guevara pressed him to identify one photo as a person who looked like he could be the shooter.

62.     After this identification procedure, Defendants gave Lopez the name Rivera, Plaintiff's last name, and Defendants said they knew it was him.

63.     Defendants did not memorialize this identification procedure at any time. And Defendants concealed that Lopez could not identify a single photo, but instead identified 5 to 6 photos of people that looked like the shooter.

64.     Defendant Guevara then took Plaintiff's photo and manufactured a suggestive photo array centered on Rivera.

65.     On June 10, 1996, Defendant Guevara went to Lopez's house alone, bringing the photo array he had constructed with him.

66.     There was identifying information on the back of the six polaroid pictures in the array, including on the photo of Plaintiff.

67.     Through Defendant Guevara's manipulation and coercion, including earlier actions in which he told Lopez that the perpetrator was Rivera and singled him out, Guevara was able to get Lopez to falsely identify Plaintiff as the shooter.

68.     Plaintiff was arrested on June 17, 1996.

69.     On the day of his arrest, Plaintiff told Defendants that he was at home at the time of the shooting and that he had three witnesses who could testify to it.

70.     Defendants ignored Plaintiff and placed him in a lineup conducted by Defendant Guevara and his partner, Defendant Halvorsen.

71.     Again, based on Defendants' manipulation and coercion, across multiple documented and undocumented identification procedures, Defendants Guevara and Halvorsen got Lopez to falsely identify Plaintiff in the lineup.

72.     Lopez was not sure if the person Defendants steered him to pick was actually the shooter, bur Defendants suppressed all evidence of Lopez's uncertainty. Instead, they wrote police reports making it appear as though Lopez had not exhibited any doubt in his identification of Rivera.

73.     Defendants also picked up Antonio Diaz, Maria Diaz, and Javier Cruz from the Cook County Jail and took them to Area Five to view lineups in order to corroborate Lopez's fabricated identification.

74.     None of these three witnesses could see the shooter, and could not provide any physical description of the shooter when questioned shortly after the crime.

75.     This is because, under the circumstances of the shooting, they could not have possibly seen the shooter well enough, or for long enough, to make out a face and provide any kind of reliable identification.

76.     Indeed, while in a room at the police station, Antonio and Maria Diaz both told Lopez that they had not seen the shooter.

77.     Yet, Defendants managed to get Antonio, Maria and Cruz to all identify their chosen suspect from lineups.

78.     Defendant Guevara was in the room with each of these three witnesses during the line-ups, and through the use of manipulation and coercion, secured their false identifications of Plaintiff.

79.     In addition, although Defendants claim that Plaintiff got to choose his spot in the lineup, in actuality Defendants told Plaintiff where to sit in each lineup.

80.     Defendants also purposefully concealed the photo that was taken of the lineup Maria viewed. This lineup photo would have provided evidence of Defendants' suggestive and manipulative tactics during the identification procedures.

81.     After the lineup procedures, the witnesses were allowed to sit together and discuss their identifications. Lopez, Antonio and Maria all told one another that they had doubts about whether the person they had been steered to identify was the perpetrator.

82.     Defendants never disclosed any of this exculpatory information to Plaintiff.

**Defendants Intentionally Undermine Plaintiff's Alibi**

83.     Following the lineups, Defendant Guevara fabricated a closing supplemental report.

84.     Defendant Guevara wrote falsely that Plaintiff had told Guevara that he had never left his house from January 10, 1996 until the last week of May 1996.

85.     In reality, Plaintiff had told Guevara that he and his family were not leaving their house at night during this time period because they were in fear.

86.     Consistent with a common practice used by Defendants Guevara and Halvorsen in numerous cases, they purposefully manipulated Plaintiff's statement to make his alibi appear ludicrous and inconsistent, and therefore prevent him from relying on his alibi at trial.

**Plaintiff's Wrongful Conviction and Imprisonment**

87.     As a result of the Defendants' misconduct and based on the false evidence described in this Complaint, Plaintiff was arrested, prosecuted, and convicted of murder.

88.     Plaintiff's counsel filed a motion to suppress the identifications, which was denied.

89.     At trial, Plaintiff's counsel was prepared to present Plaintiff's alibi through three witnesses that he was at home at the time of the shooting. However, because Guevara falsified Plaintiff's alibi in the closing supplemental report, the defense counsel changed course and chose not to present the alibi.

90.     As discussed further below, it is now known that Guevara routinely fabricates arrestees' statements to sound ludicrous and inconsistent precisely to prevent those accused from later presenting an alibi at trial.

91.     Apart from the Defendants' own false testimony, the case against Plaintiff rested almost entirely on the four witnesses—Antonio and Maria Diaz, Lopez, and Cruz—who all identified Plaintiff as the gunman.

92.     Defendant Guevara participated in every aspect of the inculpatory evidence against Plaintiff in this case, and that inculpatory evidence consisted entirely of witnesses identifications from individuals who did not see the shooter, who initially gave only the vaguest description of their perpetrator, and who only made identifications of Plaintiff nearly two months after the crime during identification procedures conducted by Defendants.

93.     Plaintiff was found guilty of all charges. The State sought the death penalty.

94.     In connection with his sentencing, Plaintiff proclaimed his innocence: "What happened on the day of the Murder, I don't know. All I know is that I'm convicted for something I didn't do."

95.     Plaintiff was spared the death penalty and was sentenced to 45 years in prison.

**Plaintiff's Exoneration**

96.     Plaintiff fought hard to prove his innocence.

97.     He has consistently and credibly maintained his innocence at every stage of his criminal proceedings.

98.     In court proceedings after Plaintiff's wrongful conviction, Defendant Guevara pleaded his Fifth Amendment right not to incriminate himself in response to questions about his misconduct as a Chicago Police officer, and specifically about his misconduct during the investigation of the murder of Jesus Ramos and Plaintiff's criminal case.

99.     When asked if Defendant Guevara had attempted to frame Plaintiff for the Ramos homicide and manipulate Lopez's identification, Defendant Guevara invoked his right to remain silent.

100.    On August 15, 2022, Plaintiff's conviction was overturned.

101.    The State promptly dismissed all charges.

102.    At the time of his exoneration, Plaintiff had been fighting the false charges against him in prison for more than half of his life.

103.    In March 2023, the Illinois Courts granted Plaintiff a certificate of innocence.

**Chicago's Policy and Practice of Wrongly Convicting Innocent Persons in Violation of the Constitution**

104.     The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice in scores of criminal cases like the one endured by Plaintiff.

105.     Since the 1980s, no fewer than 100 cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they did not commit.

106.     These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including but not limited to fabricating evidence, concealing exculpatory evidence, coercing confessions and statements through physical and psychological abuse, manipulating witnesses in order to influence eyewitness identifications and testimony, and using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause and without regard for the person's actual guilt or innocence.

107.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely fabricated and manipulated identification procedures to procure suspect identifications that they knew to be inaccurate.

108.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the Chicago Police Department and never disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office

and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

109.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

110.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, inter alia, Rivera v. Guevara, No. 12 C 4428 (N.D. Ill.), Fields v. City of Chicago, No. 10 C 1168 (N.D. Ill.), and Jones v. City of Chicago, No. 87 C 2536 (N.D. Ill.).

111.     The policies and practices of file suppression at issue in Fields applied throughout the timeframe from the 1980s through the 2000s, including at the time of the investigation at issue here.

112.     In addition, a set of clandestine files related to Area Five homicides—the same Detective Division involved in this case—was found in the case of Rivera v. Guevara, No. 12 C 4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

113.     The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at all relevant times, including at the Area Five Detective Division during the investigation at issue here.

114.     In addition, the City of Chicago and the Chicago Police Department routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract involuntary and false confessions and statements from suspects and witnesses. There are well over 250 documented cases of Chicago Police officers using torture and coercion to illegally

obtain confessions in homicide cases. The City had notice of this widespread practice of procuring false and coerced confessions long before the events at issue in this case.

115.     Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

116.     Prior to and during the period in which Plaintiff was falsely charged and convicted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

117.     For instance, multiple witnesses have come forward with evidence that Defendant Guevara was part of Miedzianowski's criminal enterprise. Defendant Guevara and Miedzianowski worked together in gang crimes before Defendant Guevara became homicide detective. Defendant Guevara used his status as a detective to advance the criminal drug enterprise he participated in with Miedzianowski, and to pressure drug dealers that did not do their bidding. Guevara's assistance included working with Miedzanowski to pin murders on innocent men.

118.     In the case of Klipfel v. Bentsen, No. 94 C 6415 (N.D. Ill), a federal jury in Chicago returned a Monell verdict against the City, finding that the City was responsible for maintaining a code of silence and a deeply flawed disciplinary system that allowed Chicago police officers (operating out of the very same police facilities as the Defendant Officers in this

16

case) to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations.

119. The Klipfel plaintiffs were two former federal agents from the Bureau of Alcohol, Tobacco and Firearms who brought allegations of rampant criminal misconduct among Gang Crimes officers to the attention of CPD officials. The evidence in that litigation included: Philip Cline, an Area Commander and future Chief of Detectives and Superintendent, personally filed two Internal Affairs complaints against Miedzianowski for tampering in homicide investigations, that resulted in no discipline whatsoever; and that Raymond Risley, an assistant deputy superintendent and head of Internal Affairs, not only knew about misconduct in homicide cases but actively participated in efforts to subvert the disciplinary investigation into Miedzianowski that was at the heart of the Klipfel litigation.

120. As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department, which has been acknowledged by leaders of the Chicago Police Department and elected officials in Chicago. In accordance with the code of silence, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

121. As a result of the City of Chicago's established practices, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers

accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

122.     This belief extends to the Defendants in this case. By way of example, Defendant Guevara has a long history of engaging in the kind of investigative misconduct that occurred in this case. There are dozens of known cases in which Guevara and other Chicago police officers engaged in serious investigative misconduct similar to that described above. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

123.     The City of Chicago and its Police Department also failed in the years prior to the Plaintiff's wrongful conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

  a.  The conduct of live lineup, photographic, and other identification procedures.

  b.  The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

  c.  The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

  d.  The risks of wrongful conviction and the steps police officers should take to minimize risks.

  e.  The risks of engaging in tunnel vision during investigation.

f.   The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

124.   The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

125.   The city's failure to train, supervise, and discipline its officers, including the Police Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto policies, as alleged above.

126.   The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

127.   The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

**Defendant Guevara's History of Framing Innocent Persons**

128.   As a result of the policies and practices of the Chicago Police Department, described above, Defendant Guevara has framed dozens of other innocent men and women

over the span of two decades. Like Plaintiff, these men and women have lodged independent accusations of similar misconduct against Defendant Guevara.

129.    As of the filing of this complaint, 39 men and women have had their convictions thrown out because of Defendant Guevara's misconduct. They are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, Demetrius Johnson, David Gecht, Juan Hernandez, Rosendo Hernandez, Ray Munoz, David Lugo, Carlos Andino, Daniel Rodriguez, Jaime Rios, Jose Cruz, Marilyn Mulero, Nelson Gonzalez, Johnny Flores, Adolfo Rosario, Eruby Abrego, Jeremiah Cain, Edwin Davila, Alfredo Gonzalez, Gamalier Rivera, Madeline Mendoza, and John Martinez. These men and women served hundreds of years in prison for crimes they did not commit.

130.    Defendant Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, manipulating witnesses, fabricating evidence, suppressing exculpatory evidence, and coercing false confessions and false statements from suspects and witnesses, using physical and psychological violence, all in the course of maliciously prosecuting innocent persons. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Guevara engaged in serious investigative misconduct.

131.    Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline Guevara and others, it is apparent that Guevara engaged in

such misconduct because he had every reason to believe that the City of Chicago and its Police Department condoned his behavior.

132.   Repeatedly, Defendant Guevara has invoked his Fifth Amendment right to not answer questions about allegations against him because truthful responses could subject him to criminal liability. The allegations Defendant Guevara has refused to respond to include allegations that he has manipulated dozens of witnesses to provide false identifications, he has fabricated false evidence, he has suppressed exculpatory evidence, including documentary evidence, he has tortured and abused suspects and witnesses and has coerced false statements from them, as well as every single instance of misconduct detailed below.

133.   A few examples of Defendant Guevara's misconduct include:

a.   Bill Dorsch is a former Chicago police detective. While serving with the Chicago Police Department, Dorsch was assigned to investigate a murder. Several months after the murder occurred, Defendant Guevara brought to the police station two juveniles purporting to have witnessed a shooting and recorded the license place of the shooter. Based on the information provided, Detective Dorsch created a photo array for the juveniles in an attempt to identify the shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the juvenile "That's him."  The juvenile then agreed with Guevara, identifying the flagged individual as the shooter. Following this, Dorsch directed Defendant Guevara to leave the room and had the other juvenile view the same photo array; this juvenile was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke

to the two juveniles outside of Defendant Guevara's presence. The juveniles admitted that they were paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

b. Defendant Guevara's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago police officer Joseph Miedzianowski and his associates, including Defendant Guevara. The report details that Defendant Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

c. In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara made Perez get inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Johnson to take the blame for the murder. Unsurprisingly, Perez went on to falsely identify Johnson as one of the murderers.

d. In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

e. Juan Johnson was exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

f.  In 1988, Defendant Guevara caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was convicted of the Valentin murder. In 2011, Lopez testified at an evidentiary hearing that he knew Rivera was the "wrong guy" when he made the identification. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges and Rivera was granted a certificate of innocence.

g.  Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed that the victim, Valentin, identified Jacques Rivera as his shooter before he died. Defendant Guevara reported to have obtained this identification at a time when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. Valentin could not possibly have provided the information that Defendant Guevara attributed to him.

h.  After Jacques Rivera's exoneration, he brought suit against Defendant Guevara. A federal jury found that Guevara had violated Rivera's civil rights and awarded Rivera $17 million in damages, as well as $175,000 in punitive damages against Defendant Guevara, his partner Steve Gawrys, and his supervisor Ed Mingey.

i.  In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz, saying that if Muniz did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

j.  In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false

23

identification by telling him who to identify and making a veiled threat as to what would happen if he did not comply.

k. In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the grand jury. Guevara threatened that if Rosario did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

l. In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup. As a result, these men falsely accused Colon of committing a murder, but later came forward to recant and shed light on Defendant Guevara's misconduct.

m. In 1993, Defendant Guevara coerced an identification from Carl Richmond with threats, saying that he could make Richmond's life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat.

n. In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained Davila to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila maintained that he was uninvolved, Guevara forced Davila to participate in a lineup in which two

witnesses identified Davila as the perpetrator, despite that each of those witnesses previously told the police that they had not been able to see the shooter.

o. In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that, if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

p. In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

q. In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand," saying that he "felt like smacking" her. Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

r. In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragoza was intimidated by Guevara and identified Ricardo Rodriguez as the offender because Guevara told him that Rodriguez was the shooter.

s.   In 1995, Defendant Guevara told Jose Melendez to falsely identify Thomas Sierra
as the shooter of Noel Andujar, even though Melendez had not seen the shooter
and told Defendant Guevara as much. In addition, Defendant Guevara wrote false
reports saying that Jose Melendez and Alberto Rodriguez had identified a car as
the one used in the Andujar shooting, when in fact both men had told Defendant
Guevara that the car in question was not the one used in the shooting.

t.   In 1996, Defendant Guevara coerced Maria Rivera into making a false
identification by unzipping his pants and propositioning her. Rivera later told the
prosecutor that she had falsely identified an individual in a lineup at Guevara's
direction. The prosecution abandoned murder charges against that individual.

u.   In 1997, Defendant Guevara coerced Robert Ruiz into making a false
identification. Guevara detained Ruiz repeatedly over the course of a ten-day
period, locking him in an interrogation room without food, water, or a bathroom.
Though Ruiz kept telling Guevara that he had not seen the shooter or the driver
involved in the crime, Guevara told Ruiz whom to identify and what to say in his
statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder
because Ruiz believed that Guevara would continue to harass him until he
changed his story. Ruiz recanted his identification at trial, and the judge found
Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing
that Guevara was the lead detective in the case because the victim was Guevara's
nephew.

v.   In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a
trial in which Guevara was testifying and observed the testimony of trial

witnesses. She then conferred with Guevara, even though the Court had ordered for all witnesses to be excluded from the courtroom to prevent witness collusion.

w. In 2011, the First District Appellate Court granted Tony Gonzalez a post-conviction hearing based on evidence that Defendant Guevara conducted an unduly suggestive lineup. In this instance, Guevara had concocted a photo array in which Gonzalez's photo was the only one that stood out from the rest.

x. In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out of the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS).

y. In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and her two children, and left the home in shambles. Lloyd filed a complaint with OPS the next day.

z. In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for

his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claims that the Area Five police beat him. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action against the City of Chicago on Hunt's claim of excessive detention.

aa.  In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year old sister, Ana, during a search of their home. During the search, officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch," and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital.

bb.  In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied any knowledge of the incident Guevara was asking about, Guevara repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head.

cc.  In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him, and hit him in the head. Garcia filed a complaint with OPS. Although Guevara denied the charges, Garcia's complaints were corroborated by physical evidence, as Garcia was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that Guevara had lied about the incident and recommended that Guevara be suspended for two days.

dd.     In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claims that he had been beaten while in police custody.

ee.     In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with OPS. OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

ff.     In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime that he had nothing to do with.

gg.     In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed, he would serve seven years in prison; if he did not confess, he would

be sent away for fifty years. Guevara then promised Rivera that if signed a
statement, he could go home.

hh.  In 1992, Defendant Guevara engaged in misconduct when he interrogated
Jacqueline Montanez without a youth officer present. The appellate court reversed
and remanded Ms. Montanez's conviction for murder, nothing that "not only was
the defendant interrogated before having an opportunity to confer with a
concerned adult, but, worse, any opportunity to do so was effectively frustrated by
police."

ii.  In 1993, Defendant Guevara arrested 15-year-old Eliezar Cruzado and threatened
him with life imprisonment if Cruzado did not make a statement implicating
himself in a murder. Guevara also told Cruzado that he could go home and see his
family again, but only if he agreed to make a statement. At the time, Cruzado had
a limited ability to read and write.

jj.  In 1993, Defendant Guevara used physical force and threats to coerce a false
confession from Adolfo Frias-Munoz. Over the course of the two-day
interrogation, Frias-Munoz was handcuffed to a ring on the wall of the
interrogation room, hit in the face with an open hand by Defendant Guevara, and
beaten by two other officers. Though isolated in a locked interrogation room,
Frias-Munoz could hear his wife screaming and his son crying in another room.
Guevara threatened Frias-Munoz that if he did not confess, his wife would go to
prison and his children would be taken away. Frias-Munoz, who did not speak
English, agreed to give a statement to an Assistant State's Attorney. Frias-Munoz
spoke in Spanish and Guevara translated the statement so that the prosecutor

could write the statement in English. Frias-Munoz then signed a statement that he could not read.

kk. In 1993, Defendant Guevara physically abused and threatened Francisco Vicente into providing false statements implicating Geraldo Iglesias in a murder. Vicente claimed that Iglesias spontaneously confessed to him that he was guilty of the crime for which Guevara had arrested him. Vicente has since testified that his statements were false and that Defendant Guevara and his colleagues beat him, threatened him, and fed him facts to ensure that he told their story.

ll. In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying. Duta repeatedly said that he did not know what he had signed and had only signed the document so he could go home. Duta complained to his father of being struck in the head and stomach by Guevara.

mm. In 1995, Defendants Guevara and Halvorsen coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the 11-hour interrogation, Guevara yelled at him, slapped him numerous times on the side of his head, and told him that, if he did not confess, he would never see the light of day. Flores eventually gave a statement to the police indicating his involvement in the crime. Flores' statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of Miranda.

31

nn. In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while he was chained to a wall in a locked interrogation room. Dembski, a Polish national who did not speak English, was interrogated by Guevara without Miranda warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

oo. In 1997, Defendant Guevara used threats and physical force against Ariel Gomez, Paul Yalda, and several of their co-defendants to try to get them to sign false statements incriminating Gomez in the shooting of Concepcion Diaz. Guevara also used pressure and threats to try to force three eyewitnesses, Ruth Antonetty, Debbie Daniels and Maria Castro, to falsely identify Ariel Gomez as the shooter even after they informed Guevara that they could not identify him as the shooter.

pp. In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Mejia never confessed and was finally released after being held in custody for three days.

qq. In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated. She asserts that Guevara *never* took an accurate statement from her, despite that she did have real knowledge of the crime he was questioning her about.

rr. In 1998, Defendant Guevara repeatedly threatened and beat Arturo DeLeon-Reyes in order to coerce DeLeon-Reyes into giving an incriminating statement. After two days of isolation and interrogation, DeLeon-Reyes provided a false statement implicating himself in a murder in which he was not involved.

ss.     In 1998, Defendant Guevara repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so that the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

tt.     In 1999, Defendant Guevara and his colleagues repeatedly punched David Gecht in the stomach and back and struck him during an interrogation. After this prolonged abuse, Gecht told Guevara and the other officers he would do "whatever they wanted," and adopted a fabricated statement, fed to him by Guevara, confessing to a shooting of which he had no knowledge.

uu.     In addition, Guevara threatened Gecht's girlfriend, Colleen Miller, telling her that she would be arrested and that the child she was expecting would be born in prison and then taken from her if she did not cooperate with them. Guevara used Miller's fear for herself and her unborn child to extract a fabricated statement from her implicating Gecht in the shooting.

vv.     In 1991, Defendant Guevara framed Demetrius Johnson for killing Edwin Fred. Guevara suppressed a lineup report documenting that a key eyewitness had identified a different person as the perpetrator in a lineup, and he fabricated a false police report to make it appear as if that identification had never occurred. In addition, to support his case against Johnson, Guevara manipulated and fabricated eyewitness identifications of Johnson as the shooter from witnesses Rosa Burgos, Ricardo Burgos, and Elba Burgos.

134.     Defendant Guevara never received discipline from the City of Chicago or the Chicago Police Department for any of the conduct set out above.

135.     In fact, the City of Chicago failed to supervise or discipline its police officers, including Defendants Guevara and the other Defendants. Defendants engaged in the misconduct set forth in this complaint because they knew that the City of Chicago and its Police Department tolerated and condoned such conduct.

**COUNT I**
**42 U.S.C. § 1983 – Due Process**
**(Fourteenth Amendment)**

136.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

137.     As described in detail above, the Defendants while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

138.     In the manner described more fully above, the Defendants fabricated witness statements falsely implicating Plaintiff in the crime.

139.     The Defendants knew this evidence was false.

140.     The Defendants obtained Plaintiff's conviction using this false evidence, and they failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

141.     In addition, the Defendants deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that that Defendants had manufactured false identifications of Plaintiff, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

142. In addition, based upon information and belief, the Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff.

143. Defendants also procured supposed eyewitness identifications of Plaintiff, which they knew to be false and unreliable, using unduly suggestive procedures. Despite this, Defendants caused these false identifications to be used during Plaintiff's criminal trial.

144. The Defendants' misconduct resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

145. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

146. As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

147. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT II
### 42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention
### (Fourth and Fourteenth Amendments)

148. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

149. In the manner described above, the Defendants individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their

employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

150.    In so doing, these Defendants maliciously prosecuted Plaintiff and caused Plaintiff to be deprived of his liberty without probable cause and to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

151.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

152.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

153.    The misconduct described in this Count by the Defendants was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

**COUNT III**
**42 U.S.C. § 1983 – Failure to Intervene**

154.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

155.    In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

156.    These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

36

157.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

158.     As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

159.     The misconduct described in this Count by the Defendants was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

**COUNT IV**
**42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights**

160.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

161.     In the manner described more fully above, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to fabricate evidence, suppress evidence, and coerce identifications to detain, prosecute, and convict Plaintiff, without regard for Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

162.     In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

163.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

164.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

165.     As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

166.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

### COUNT V
### 42 U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago

167.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

168.     As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

169.     At all times relevant to the events described in this complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; the conduct of interrogations and questioning of criminal suspects; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

170.    These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

171.    In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

172.    Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not

properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

173.     In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

174.     These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

175.     The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

176.     As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly convicted of crimes that they did not commit.

40

177.    In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

178.    Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT VI
## State Law Claim – Malicious Prosecution

179.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

180.    In the manner described above, the Defendants individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

181.    In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

182.    The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in August 2022.

183.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

184.     As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VII
### State Law Claim – Intentional Infliction of Emotional Distress

185.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

186.     The actions, omissions, and conduct of the Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

187.     As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII
### State Law Claim – Willful and Wanton Conduct

188.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

189.     At all times relevant to this complaint the Defendants had a duty to refrain from willful and wanton conduct.

190.     Notwithstanding that duty, these Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

191.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT IX**
**State Law Claim – Civil Conspiracy**

192.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

193.    As described more fully in the preceding paragraphs, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

194.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

195.    The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

196.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

197.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT X**
**State Law Claim – *Respondeat Superior***

198.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

199.     While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

200.     Defendant City of Chicago is liable as principal for all torts committed by its agents.

**COUNT XI**
**State Law Claim - Indemnification**

201.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

202.     Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

203.     The Police Officer Defendants were employees, members, and agents of Defendant City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

204.     Defendant City of Chicago is responsible to pay any judgment entered against the Defendants.

WHEREFORE, Plaintiff GAMALIER RIVERA, respectfully requests that this Court enter a judgment in his favor and against Defendants REYNALDO GUEVARA, GERI LYNN YANOW, as special administrator of the ESTATE OF ERNEST HALVORSEN, ANTHONY RICCIO, ROBERT BIEBEL, and the CITY OF CHICAGO, awarding compensatory damages,

attorneys' fees, and costs against each Defendant, punitive damages against each of the Individual Defendants, and any other relief that this Court deems just and appropriate.

**JURY DEMAND**

Plaintiff, GAMALIER RIVERA, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

**GAMALIER RIVERA**

BY:    <u>s/ Annie Prossnitz</u>

        *One of Plaintiff's Attorneys*

Jon Loevy
Anand Swaminathan
Steve Art
Sean Starr
Annie Prossnitz
**LOEVY & LOEVY**
311 N. Aberdeen, Third Floor
Chicago, IL 60607